**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **FLYPSI, INC. (D/B/A FLYP),** | **Civil Action No. 6:22-cv-31-ADA** |
| **Plaintiff,** | |
| **vs.** | **JURY TRIAL DEMANDED** |
| **GOOGLE LLC,** | █████████████ |
| **Defendant.** | |

**PLAINTIFF FLYP'S MOTION TO STRIKE THE**
**EXPERT REPORTS OF DR. ODED GOTTESMAN, PH.D**
<u>**REGARDING NONINFRINGEMENT AND INVALIDITY**</u>

**TABLE OF CONTENTS**

I.   ARGUMENT ................................................................................................................. 1

   A.   Dr. Gottesman's noninfringement positions are unreliable because they are improperly premised on untimely claim-construction arguments. ........................................... 2

      1.   For the Inbound Patents, Dr. Gottesman's opinions are improperly based on excluding VoIP based on alleged disclaimers by the patentee during prosecution and when describing its commercial product. ............................................................ 3

      2.   For the Inbound Patents and the Outbound Patents, Dr. Gottesman's opinions are based on untimely constructions of "switch" that would exclude software switches ............ 7

      3.   For the Outbound Patents, Dr. Gottesman improperly construes "receiving, at the switch, information from the server directing the switch to" to mean the server must control the switch. ...................................................................................................... 9

      4.   For the '770 Patent, Dr. Gottesman improperly construes "the at least one data channel" to be limited to only one data channel. ................................................ 11

   B.   Dr. Gottesman's opinions that Google Voice anticipated the Inbound Patents, or included prior commercial use of the accused inbound VoIP functionality, are unreliable because they are premised on an improper understanding of method claims and incorporate impermissible hindsight. .......................................................................................... 11

   C.   Dr. Gottesman's opinions on anticipation, obviousness, and prior commercial use based on the Nokia N80 Internet Edition should be excluded because they are based on undisclosed invalidity theories ................................................................................................... 17

   D.   Dr. Gottesman's opinions on obviousness are unreliable because they rely on legally deficient motivations to combine .......................................................................... 19

   E.   Dr. Gottesman's opinion regarding noninfringing alternatives are unreliable because they are conclusory and premised on the wrong date. ............................................ 22

   F.   Dr. Gottesman should be excluded from relying on documents not timely produced in this litigation. ........................................................................................................... 29

   G.   Dr. Gottesman should be precluded from offering opinions based on the conclusory charts attached to his invalidity report. ................................................................ 29

   H.   Dr. Gottesman should be precluded from offering opinions on Burner ........................ 30

II.   CONCLUSION ......................................................................................................... 30

████████████████████████████

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alacritech Inc. v. CenturyLink, Inc.*,
    2023 WL 6797787 (E.D. Tex. Oct. 2, 2023) ........................................................22

*Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.*,
    838 F. App'x 555 (Fed. Cir. 2021), *cert. denied*, 141 S. Ct. 2721 (2021)..............21

*Cordis Corp. v. Boston Sci. Corp.*,
    561 F.3d 1319 (Fed. Cir. 2009)................................................................................2

*Daedalus Blue LLC v. SZ DJI Tech. Co.*,
    Case No. W-20-CV-73-ADA, 2022 WL 831619 (W.D. Tex. Feb. 24, 2022)..........1

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)................................................................................................1

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*,
    540 F.3d 1337 (Fed. Cir. 2008)..............................................................................5

*Mettler-Toledo, Inc. v. Fairbanks Scales, Inc.*,
    No. 9:06-CV-97, 2008 WL 11348468 (E.D. Tex. Oct. 27, 2008) ..........................30

*Mobile Equity Corp. v. Walmart Inc.*,
    2022 WL 19917854 (E.D. Tex. Sept. 23, 2022) ................................................2, 3

*Mobile Telecomms. Techs., LLC v. Blackberry Corp.*,
    2016 WL 2907735 (N.D. Tex. May 17, 2016) ................................................17, 20

*Myco Indus., Inc. v. BlephEx, LLC*,
    955 F.3d 1 (Fed. Cir. 2020).....................................................................................5

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)............................................................................17

*Pisony v. Commando Constrs., Inc.*,
    2020 WL 4934463 (W.D. Tex. Aug. 24, 2020)..............................................17, 18

*Poly-Am., L.P. v. GSE Lining Tech., Inc.*,
    383 F.3d 1303 (Fed. Cir. 2004)............................................................................12

*Securus Techs., Inc. v. Glob. Tel*Link Corp.*,
    701 F. App'x 971 (Fed. Cir. 2017) ........................................................................21

*TQ Delta, LLC v. Cisco Sys., Inc.*,
    942 F.3d 1352 (Fed. Cir. 2019)...........................................................................................21

*In re Van Os*,
    844 F.3d 1359 (Fed. Cir. 2017)...........................................................................................21

*Ziilabs Inc., Ltd. v. Samsung Elecs. Co.*,
    2015 WL 8274055 (E.D. Tex. Dec. 8, 2015)..........................................................................3

**Other Authorities**

Fed. R. Civ. P. 26...........................................................................................................................1

Fed. R. Evid. 702..........................................................................................................................1

███████████████████████████████████

**TABLE OF EXHIBITS**[1]

| No. | Brief Description |
|-----|------------------|
| 1 | Expert Report of Oded Gottesman on Noninfringement |
| 2 | Expert Report of Oded Gottesman on Invalidity |
| 3 | Gottesman Deposition Day 1 |
| 4 | Gottesman Deposition Day 2 |
| 5 | Video of Dr. Gottesman discussing ¶ 2 from his noninfringement report |
| 6 | Video of Dr. Gottesman attempting to derive information from his own charts |
| 7 | Source Code Supplement in Connection with Exhibit T-1 – GrandCentral & Google Voice |
| 8 | Source Code Supplement in Connection with Exhibit T-2 – GrandCentral & Google Voice |
| 9 | Supplement in Connection with Exhibit W-1 – Burner Phone |
| 10 | Supplement in Connection with Exhibit W-2 – Burner Phone |
| 11 | Flyp's First Set of Requests for Production to Google |
| 12 | Deposition Transcript of ██████████ (dated August 15, 2023) |

---

[1] The undersigned hereby states that true and correct copies of the exhibits noted here are attached to this Motion.

███████████████████████████████████████

Flyp moves the Court to strike certain opinions from Dr. Gottesman's expert reports on noninfringement and invalidity and preclude him from testifying about those topics at trial. As explained below, many of Dr. Gottesman's opinions are unreliable because they are premised on improper claim constructions, misapply the law, rely on theories or materials not timely disclosed, or lack analysis, rendering them impermissibly conclusory. Allowing Dr. Gottesman to testify about those opinions at trial would likely confuse the jury and would certainly materially prejudice Flyp.

As the Court is familiar with general motion-to-strike standards and related legal precedents under both FRCP 26 and FRE 702, Flyp will refrain from reciting them here. *See Daedalus Blue LLC v. SZ DJI Tech. Co.*, Case No. W-20-CV-73-ADA, 2022 WL 831619, at *2– 3 (W.D. Tex. Feb. 24, 2022) (citing, *inter alia*, Fed. R. Civ. P. 26, Fed. R. Evid. 702, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993)). Rather, Flyp will focus below on the legal precedents specific to this Motion.

## I.      ARGUMENT

Flyp requests that the Court strike opinions from two expert reports that Dr. Oded Gottesman submitted in this case: (1) Expert Report of Oded Gottesman, Ph.D, Regarding Noninfringement of U.S. Patent Nos. 9,667,770; 10,051,105; 10,334,094; 11,012,554; and 11,218,585 (Oct. 10, 2023) (attached as Ex. 1); and (2) Expert Report of Oded Gottesman, Ph.D, Regarding Invalidity of U.S. Patent Nos. 9,667,770; 10,051,105; 10,334,094; 11,012,554; and 11,218,585 (Sep. 12, 2023) (attached as Ex. 2). The patents at issue in this case (and those reports) relate to methods for inbound and outbound calls to handsets/mobile devices. The asserted claims in U.S. Patent Nos. 9,667,770 and 10,051,105 (the "Inbound Patents") relate to processing rules and call flows for calls being received to a secondary phone number on a telephone handset/mobile

device. The asserted claims in U.S. Patent Nos. 10,334,094; 11,012,554; and 11,218,585 (the "Outbound Patents") relate to processing rules and call flows for calls being made from a secondary phone number on a telephone handset/mobile device.

Dr. Gottesman opines that Google Voice infringes no asserted claims from the Inbound Patents or Outbound Patents. He also opines all asserted claims in the Inbound Patents and Outbound Patents are invalid. Dr. Gottesman further opines about the existence of various noninfringing alternatives. But from the very outset of Dr. Gottesman's deposition (Ex. 3 (Day One); Ex. 4 (Day Two)), it was clear that he was unfamiliar with the analysis underlying his opinions. *See* Ex. 5 (discussing ¶ 2 of the noninfringement report). Even given the opportunity to review the charts attached to his report, Dr. Gottesman was unable to answer basic questions about how his mapping of the asserted prior art related to the claim limitations. *See* Ex. 6 (discussing Burner). And as explained below, based on the explanations that Dr. Gottesman was able to give, many of his opinions are unreliable.

### A. Dr. Gottesman's noninfringement positions are unreliable because they are improperly premised on untimely claim-construction arguments.

Dr. Gottesman's noninfringement report is almost entirely premised on untimely and incorrect claim constructions of various terms that Google never proposed and the Court never considered. The time for Google to propose terms for constructions has long passed, and it is not an appropriate subject for Dr. Gottesman to opine upon to the jury. "It is improper for experts to argue claim construction to the jury because the 'risk of confusing the jury is high when experts opine on claim construction.'" *Mobile Equity Corp. v. Walmart Inc.*, 2022 WL 19917854, at *2 (E.D. Tex. Sept. 23, 2022) (quoting *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009). In particular, experts "cannot rely on statements in the prosecution history to limit the ordinary meaning of the term. That is for the Court." *Id.* (quoting *Ziilabs Inc., Ltd. v. Samsung*



*Elecs. Co.*, 2015 WL 8274055, at *2 (E.D. Tex. Dec. 8, 2015)).

> **1.    For the Inbound Patents, Dr. Gottesman's opinions are improperly based on excluding VoIP based on alleged disclaimers by the patentee during prosecution and when describing its commercial product.**

Dr. Gottesman offers various noninfringement opinions based on his contention that two terms—bridge telephone number and voice channel—should be limited to PSTN calling and accordingly exclude VoIP calling. Google never asked the Court to construe those terms. Dr. Gottesman nonetheless explained during his deposition that he has limited these two terms in his noninfringement analysis based on statements in the prosecution history and from the inventors about Flyp's commercial product that he believes disclaim embodiments using VoIP ( ██████ ██████████████████ ):





Ex. 3 at 183:11–184:19, 185:5-15, 242:11–243:9 ("

"); Ex. 4 at 410:9–14 ("

").

These improper claim constructions pervade Dr. Gottesman's noninfringement analysis. In ¶¶ 59–76 of his noninfringement report, he opines that

, as Dr. Nettles opines. Ex. 1 at ¶ 76, 59 ("

" (emphasis added)). In ¶¶ 77–86 of his report, Dr. Gottesman opines that a

Id. ¶ 79. He doubled down on this position during his deposition, contending that telephone number should be construed to mean "a phone number that you dial in a PSTN network." Ex. 3 at 233:13–234:2.

Dr. Gottesman similarly opines in paragraphs 107–110 of his noninfringement report that the asserted claims from the Inbound Patents "cannot cover VoIP calling" because he limits the



term "voice channel" to "require PSTN/Cellular voice services." Ex. 3. He incorporates into this discussion paragraphs 142–149 of his invalidity report. *Id.* at ¶ 108.

To reach these conclusions, Dr. Gottsman improperly engages in prototypical claim construction for the terms bridge telephone number and voice channel, citing disclosures from Asserted Patents' specification and figures to support his incorrect constructions that would limit the claims to a preferred embodiment that utilizes PSTN. *See id.* ¶ 59; Ex. 2 ¶¶ 142–44.

But worse, while stepping into the Court's role and construing these terms, Dr. Gottesman relies on improper material too. Claim construction should not be premised on the patentee's commercial embodiment. *See, e.g.*, *Myco Indus., Inc. v. BlephEx, LLC*, 955 F.3d 1, 15 (Fed. Cir. 2020). Nor should the claim scope be determined based on inventor testimony. *See, e.g.*, *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008). Yet in forming his opinions that the bridge telephone number and voice channel in the claims are limited to PSTN embodiments (and exclude VoIP), Dr. Gottesman extensively relied on his understanding



Ex. 4 at 405:17–407:14; Ex. 3 at 154:17–155:3 ("

"), 181:10–181:25 ("

"); Ex. 2 ¶¶ 147 ("

"), 148–

49 (

).

Flyp thus asks that the Court strike and exclude any of Dr. Gottesman's noninfringement

opinions that apply the terms "bridge telephone number" or "voice channel," particularly when

those opinions rely on limiting the Inbound Patents' claims' scopes to PSTN embodiments (i.e.,

████████████████████████████████████████

excluding VoIP) (*e.g.*, Ex. 1 ¶¶ 59–86, 107–110; Ex. 2 ¶¶ 142–49; Ex. 7; Ex. 8; Ex. 9; Ex. 10).

> **2.     For the Inbound Patents and the Outbound Patents, Dr. Gottesman's opinions are based on untimely constructions of "switch" that would exclude software switches.**

Dr. Gottesman again engages in impermissible claim construction in construing the term

switch to be limited to switches directly connected to the PSTN—and to exclude VoIP software

switches. Dr. Gottesman admits that one type of switch is a VoIP software switch:

> Similarly to the POTS switch, a VoIP software switch (softswitch) has two main functions: call management (or switching), and voice transmission. The "softswitch," which is also known as a SIP proxy or Call Manager, is a vital feature of a VoIP program. Its primary role is to help in call initiation. The softswitch also handles terminals and controls admission to the VoIP system as well as enables terminal confirmation, registration, state and address resolution, and call regulation.

Ex. 2 ¶¶ 47, 157 ("Then the proxy switch 'bridges' the two SIP legs and bidirectional voice

transmission starts either directly between them or though the server (or soft-switch), if needed the

soft-switch also translating the voice traffic between two legs."). Dr. Gottesman also admits that

such VoIP software switches were known in the art by 2013:

> Q.  What is a VoIP software switch?
>
> A.  So that would be a software switch that is used to route packets, for example, in Voice over IP. …
>
> Q.  Is it correct that a person of ordinary skill in the art in 2013 would have known about these VoIP software switches?
>
> A.  Yes.

Ex. 4 at 283:7–283:25.

Dr. Gottesman, however, explained during his deposition that he had narrowed the

meaning of switch in the claims to exclude software switches, like VoIP switches:

> Q.  What is a switch?
>
> A.  It depends on the context. If you talk about the patent, a switch is basically a PSTN switch.

████████████████████████████████████████████████

Q. So the understanding that you're applying of switch in forming your analysis is that it's a PSTN switch?

A. Depending which analysis you're referring to. If you're referring to the noninfringement, that is my position. It's basically a PSTN switch because the patents are all about PSTN, so it's PSTN switch. And also, there are certain requirement within the claim and the claim elements that are related to the switch. And some of them require that the switch may be associated with some bridge cell phone numbers, some are about Voice channels connected to the switch. The switch in the patent is connected to a PSTN network. So I applied those aspects of the switch to the noninfringement analysis.

In the validity analysis, I took the position -- the more broad position of, you know, that plaintiff took and I applied that to the analysis of the invalidity.

Ex. 3 at 55:4–56:2, 64:22–65:23 ("But, again, a soft switch is not a PSTN switch. It's a software that's called a soft switch, but it is not the switch, the claim switch. … A piece of software -- there is a piece of software that is called soft switch, which is different from the claim switch."), 66:8–11 ("If you talk about a PSTN, which I believe the scope of the patent, then soft switch is not part -- is not within the scope of a PSTN switch.").

Beyond simply excluding software switches, Dr. Gottesman imported a limitation into the term switch that requires it be connected directly to the PSTN: "But if you're asking in the context of the patent, then the patents clearly talk about a switch connected to a PSTN and connected with voice channels to a PSTN, then that indicates to me that *the switch has to be connected directly to the PSTN*." Ex. 3 at 69:10–70:4 (emphasis added).

This untimely and improper construction ultimately underlies the opinions in his report that





*Id.* at 70:12–71:8, 73:23–73:25 ("                                                                              "); *see also* Ex. 1 ¶¶ 93–96.

Flyp thus asks that the Court strike and exclude any of Dr. Gottesman's noninfringement opinions that rely on applying the term "switch," including his opinions that █████████████ █████ is not a switch (Ex. 1 ¶¶ 93–96).

        **3.**       **For the Outbound Patents, Dr. Gottesman improperly construes "receiving, at the switch, information from the server directing the switch to" to mean the server must control the switch.**

In each of the Outbound Patents, the claims each require that the switch receive information from the server that directs the switch to connect the outgoing call:

receiving, at the switch, information from the server directing the switch to:

(a) connect the outgoing call to a contact telephone number associated with the primary telephone number and bridge or access telephone number pairing, and

(b) identify a telephone number from which the outgoing call is being made as the secondary telephone number.

*See, e.g.,* '094 patent at claim 1. Dr. Gottesman construes this limitation to require more than receiving information—according to Dr. Gottesman, the server must have some undefined level of "control" over the switch:

█████████████████████████████████████████



Ex. 3 at 132:2–132:18 (emphases added). In fact, confronted with testimony from Google's

corporate designee, ████████, that ████████████████████████████

████████████████, Dr. Gottesman clarified that he does not consider receiving instructions

to be within the scope of the claims:

> Q.  Within the context of the claims, do you see a difference between receiving instructions and directing?
>
> A.  Yes. They mean totally different, right?
>
> Q.  How are they different?
>
> A.  Well, one part receive instruction, the other part directs, right? It's two different parties, right?



Ex. 3 at 134:1–16, 133:2–13 ("████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████" (quoting Ex. 12

████ Dep. Tr. 21:2–5) (emphasis added))).

███████████████████████████████

Flyp thus requests that the Court strike and exclude any of Dr. Gottesman's noninfringement opinions that rely on applying these limitations, including his opinions that ███

███████████████████████ (Ex. 1 ¶¶ 97–106; Ex. 7; Ex. 8; Ex. 9; Ex. 10).

> **4.**     **For the '770 Patent, Dr. Gottesman improperly construes "the at least one data channel" to be limited to only one data channel.**

Dr. Gottesman again engages in improper claim construction by construing claim 1 from the '770 patent to require that one data channel must carry both the second digital information and the pre-call information. The pertinent claim language is as follows:

> acquiring second digital information from the handset over the **at least one data channel**,
>
> the second digital information indicating secondary call processing rules for handling calls directed to the secondary telephone number . . .
>
> transmitting pre-call information to the handset over the **at least one data channel** the precall information

Ex. 1 ¶ 15 (quoting '770 patent, claim 1). The plain language of the claim contemplates that there may be more than one (at least one) data channel. Nonetheless, Dr. Gottesman construes the claim as requiring a single data channel for transmitting the second digital information and the precall information. *See id.* ("According to the plain meaning of the claim language the same data channel that acquires second digital information must be used for transmitting the pre-call information.").

Flyp thus requests that the Court strike and exclude any of Dr. Gottesman's noninfringement opinions that rely on applying these limitations (*e.g.*, Ex. 1 ¶ 15).

> **B.**     **Dr. Gottesman's opinions that Google Voice anticipated the Inbound Patents, or included prior commercial use of the accused inbound VoIP functionality, are unreliable because they are premised on an improper understanding of method claims and incorporate impermissible hindsight.**

Dr. Gottesman opines that based on the accused inbound functionality, Google Voice anticipates the Inbound Patents, or constitutes prior commercial use of the accused inbound



functionality, based on integration ████████████. *See* Ex. 2 ¶¶ 194, 229. These opinions
are unreliable because (1) Dr. Gottesman improperly combines functionality from distinct systems
under the auspices of anticipation and/or prior commercial use; and (2) Dr. Gottesman premises
this supposed anticipation and/or prior commercial use of method claims on systems he contends
*could* perform the claimed steps without any evidence those steps were ever in fact performed. But
that a system may be capable of performing a claimed method is not sufficient to anticipate the
method or show that it was in actual prior use. *See generally, e.g.*, *Poly-Am., L.P. v. GSE Lining
Tech., Inc.*, 383 F.3d 1303, 1309 (Fed. Cir. 2004) ("GSE's argument that the Gundle die was
capable of performing the claimed method is largely premised on the hindsight that its choker
slides were able to achieve an objective they were not originally designed to do.").

To start, Dr. Gottesman admits that he relies on alleged integration with ████████
because Google Voice did not include the accused inbound functionality in its own applications
until long after the priority date:

Ex. 3 at 160:19–161:12.

████████████. Ex. 2 ¶ 99. He admits

██████████████████████████████████████████

that ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████. *See* Ex. 4 at 352:17–352:20.

But Dr. Gottesman admits that ██████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

*Id.* at 354:15–355:4, 356:10–356:17 (emphasis added). Dr. Gottesman also concedes that even if

the ████████████████████████████████████████

████████████████████████████████████████████

██████. Id. at 372:12–16 (" ████████████████████████

████████████████████████████████████████████

████████████████████████"). According to Dr. Gottesman, to satisfy additional claim

limitations, a user would need to ██████████████████████████

██████████████████████████████:

Q.  So we have this handset element in here and there is a handset here at 1.B-



A.  Yes.

Q.  -- where it talks about acquiring first digital information from the handset over the at least one data channel. And then I believe that the handset appears again in 1.F where it says, "the incoming call being directed to handset-associated telephone number." Do you see that?

A.  You said 1.F?

Q.  Yeah. 1.F I think is just an example; is that fair?

A.  Yes.



*Id.* at 374:10–375:17. Unsurprisingly, however, Dr. Gottesman could identify no evidence that



*Id.* 375:18–376:6. In other words, Dr. Gottesman's opinion that Google Voice anticipates or

███████████████████████████████████████████████

constitutes prior use of the accused inbound functionality based on using the ███████████

████ to receive inbound VoIP calls on a handset on a mobile web browser in desktop mode is

improperly premised on his understanding that the system was *possibly* capable of such use, not

that it was ever actually used (or intended to be used) in that way.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████. He contends that Google Voice's predecessor—GrandCentral—

included integration with the Nokia N80 Internet Edition. *See* Ex. 2 ¶ 93. ██████████████

███████████████████████████████████████████████

████████████. *Id.* ¶ 94. And he points to articles that suggest GrandCentral (not Google Voice)

supported the Nokia N80 Internet Edition. *Id.* ¶ 93.

However, Dr. Gottesman cannot identify any evidence that the █████████████████

███████████████████████████████████████████████

██████████████████████ and can only say (at most) that there "could be" support for the

Nokia N80 Internet Edition in the purported prior art Google Voice:





Ex. 4 at 338:10–339:20.

In other words, as with ███████████████████, Dr. Gottesman's opinion that the purported prior-art Google Voice system anticipates based on integration with ████████ Nokia N80 Internet Edition is premised on how he believes ██████████████████ ████████████████████████████████████████████ ███████████████████████████████████.

Moreover, Dr. Gottesman's analysis of the ████████████████ with elements of GrandCentral ████████, in combination with the Nokia N80 Internet Edition, is not a legitimate anticipation argument. This is so because a patentee cannot pick and choose discrete functionality from a prior art system to satisfy various claim elements and cobble together an anticipation argument with the benefit of hindsight, as Dr. Gottesman has done here—a single prior art system must have actually practiced the claimed invention in the manner set forth in the claims. *See generally Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008).

Flyp thus requests that the Court strike and exclude any of Dr. Gottesman's anticipation

████████████████████████████████████████████

opinions for Google Voice that rely on the ███████████████████████, the Nokia N80

Internet Edition, and/or the Google Voice predecessor product, GrandCentral (e.g., Ex. 2 ¶¶ 92–

105, 194, 213, 220, 225; Ex. 1 ¶¶ 2 n.2, 30–32, 39, 55, 132, 135, 140; Ex. 7; Ex. 8; Ex. 9; Ex. 10).

    **C.**     **Dr. Gottesman's opinions on anticipation, obviousness, and prior commercial use based on the Nokia N80 Internet Edition should be excluded because they are based on undisclosed invalidity theories.**

Dr. Gottesman relies on the Nokia N80 Internet Edition under the theory that ████████

███████████████████████████████████████████████████ as a

handset anticipates, renders obvious, or shows prior commercial use of the accused inbound

functionality. Ex. 2 ¶ 93; Ex. 1 ¶¶ 30, 132, 140. In patent litigation, "expert infringement reports

may not introduce theories not previously set forth in infringement contentions." *Pisony v.

Commando Constrs., Inc.*, 2020 WL 4934463, *1 (W.D. Tex. Aug. 24, 2020) (Albright, J.).

"Ultimately, '[t]he critical question in deciding whether to strike portions of an expert report ... is

whether the expert has permissibly specified the application of a disclosed theory or impermissibly

substituted a new theory altogether.'" *Id.* (quoting *Mobile Telecomms. Techs., LLC v. Blackberry

Corp.*, 2016 WL 2907735, at *1 (N.D. Tex. May 17, 2016)).

    In its invalidity contentions, Google never disclosed the Nokia N80 Internet Edition, much

less the theory in Dr. Gottesman's report premised on an alleged integration between the Nokia

N80 Internet Edition and ███████████ (or GrandCentral). There is no excuse for this omission.

The alleged integration is with Google's own products—so Google was uniquely position to

identity and disclose its theory of that integration in its invalidity contentions consistent with the

deadlines in the Court's scheduling order. And beyond the fact that Google should have been aware

of this purported integration earlier in the case, its expert—Dr. Gottesman—testified that he has

been aware of the Nokia N80 Internet Edition since being personally involved in litigation

involving Nokia "years ago." Ex. 4 at 337:6–23. Moreover, Dr. Gottesman testified that he brought

███████████████████████████████████████████████

this alleged integration with the Nokia N80 Internet Edition with Gizmo to Google's attentions "months ago" when he found information about it in an article on the internet. Ex. 4 at 325:16–326:22. Yet Google did nothing. It waited to disclose its new invalidity theories based on integration between ██████████ (or GrandCentral) with the Nokia N80 Internet Device until it served Dr. Gottesman's invalidity report.

In determining whether to exclude expert evidence based on untimely disclosure, the Court should consider four factors: (1) the explanation for the failure; (2) the importance of the testimony; (3) the potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure the prejudice. *See Pisony*, 2020 WL 4934463, *2. Each of these factors favor exclusion. As explained above, Google has no good explanation for failing to disclose its own products' alleged integration with the Nokia N80 Internet Edition, particularly when its expert testified that he had brought it to Google's attention months ago. The testimony is of limited importance because (as explained above) there is no evidence of actual use based on that integration and, in any event, Google can still proceed on any viable invalidity theories actually disclosed in its invalidity contentions. The potential prejudice is severe, as it forces Flyp to respond about the alleged integration between ██████████ (or GrandCentral) and the Nokia N80 Internet Edition without the benefit of discovery into that alleged integration, including the opportunity to question Google's designees and witnesses about it. Finally, a continuance would only further prejudice Flyp, as the parties have extended significant resources readying this case for an imminent trial, only to be derailed based on Google's decision to omit theories from about integrations with its own products from its invalidity contentions.

Flyp thus requests that the Court strike and exclude any of Dr. Gottesman's opinions related to the Nokia N80 Internet Edition (e.g., Ex. 2 ¶ 93; Ex. 1 ¶¶ 30, 132, 140; Exs. T-1, T-2).

████████████████████████████████████

**D.      Dr. Gottesman's opinions on obviousness are unreliable because they rely on legally deficient motivations to combine.**

Despite opining on many potential obviousness combinations, Dr. Gottesman's invalidity report only identifies one specific motivation to combine: that "[t]he natural evolution of systems" is to integrate more features, though he calls this "further motivation." *See* Ex. 2 ¶¶ 200, 205. When asked during his deposition, Dr. Gottesman explained that another motivation to combine was that the systems and references used the same protocols and similar hardware (e.g., servers, processors, and memory):

> Q.  When you say, "further motivation," what prior motivation are you referring back to?
>
> A.  What I'm referring to is that they use the same standards and protocols. They provide one motivation. And further, there is a natural progression, as we see, to integrate more and more into systems. For example, in the old days cellular system included voice only. Later on SMS was added, data was added. There was -- and also cell phones. You know, the old phones included just voice service. And then the smartphone came and included more and more.
>
> And before that, there were phones, smart -- you know, media phones that included already some applications. So everywhere you go you see a natural progression that you get more and more integration into products. So that is happening. That is part of evolution, that's part of progression in our life. So that also provide additional motivation to combine.

Ex. 4 at 485:23–486:17. As Dr. Gottesman explained it, this means that when the same protocols and similar hardware is present, a person of ordinary skill in the art is motivated to add "more and more features" as a normal part of product "evolution":

> Q.  So is it your understanding then that a person of ordinary skill in the art is generally motivated just to add more and more features to assist them?
>
> A.  Usually that -- that's the case. I mean, usually when you want to make -- one way of making more -- you want to add features, you want to add value to products, normally part of the evolution is to add and to incorporate more into the product. So you see that all the time. That would be motivation for POSITA, for companies and so on, yeah.

*Id.* at 486:18–487:4. Dr. Gottesman went on to testify that his opinion on motivation to combine

is based on his understanding that the "natural evolution" of telephony means that there is always

generally a motivation to combine:

> Q.  Okay. Your opinion -- I notice that, you know, again on this sentence there is not anything specific that you're citing to. What are you basing your opinion on here about this desire to naturally progress and add more features?

> A.  Well, I'll explain it again. The evolution that I've seen was from the very beginning, you know, initially you had just telephones and then you had caller ID added and then you had phones initially just provided voice service, and then SMS was added, and then some Internet data was added, and then smartphone came and they added more.

> So I clearly saw that process. Also, look at the providers. In the old days, you had telephone providers and cable providers and they provided completely different services, right?

> I mean, one was a telephone company, the other one was a cable company. And this -- and later on both of them all of a sudden provide Internet access.

> And so you see all the time a feature added and system integrates more and more services. That's the evolution I see. That's the innovation, that's the progress that I see. That's the natural progression of things.

> Q.  So in your opinion then, there is always a motivation to combine and bring in new features to telephony; is that right? …

> A.  Generally speaking, that's the natural evolution, that's the natural motivation to combine.

*Id.* at 490:1–491:10. Dr. Gottesman could not identify any other motivations to combine in his

invalidity report beyond these two theories premised on ¶¶ 200 and 205. Ex. 4 at 493:1–15.

Yet the Federal Circuit has repeatedly affirmed that Dr. Gottesman's approach is legally

insufficient and impermissibly conclusory: references that come from the same field, or involve

similar technologies, cannot satisfy the burden of showing a motivation to combine. *See, e.g.*,

*Securus Techs., Inc. v. Glob. Tel*Link Corp.*, 701 F. App'x 971, 976 (Fed. Cir. 2017) (affirming

motivation to combine based on prior art being from the same field "was simply too conclusory");

*Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.*, 838 F. App'x 555, 557 (Fed. Cir. 2021),

*cert. denied*, 141 S. Ct. 2721 (2021) (affirming insufficient motivation when challenger "alleged the references came from the same field of study and address the same problem"). Indeed, Dr. Gottesman's opinion that there is generally always a motivation to combine telephony art without providing any specific analysis is the type of broad, conclusory statement that the Federal Circuit has long rejected because it "tracks the *ex post* reasoning *KSR* warned of and fails to identify any actual reason why a skilled artisan would have combined the elements ***in the manner claimed***." *See TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019) (quoting *In re Van Os*, 844 F.3d 1359, 1361–62 (Fed. Cir. 2017)) (emphasis added).

Strikingly, Dr. Gottesman also contradicts this position, testifying that there would not have been a motivation to use VoIP calling for the inbound call leg on mobile handsets around 2013, as he proposes in his various obviousness combinations:

> Q.  So I guess here is another question for you then. If it would have been obvious and easy to add the inbound VoIP calling to the 2013 version of the Google Voice applications, why didn't Google do it then?
>
> A.  I can -- I can speculate based on my experience. At that time, I was using a lot of different Voice over IP applications. One of them was Viber and others. Those applications worked fine when you were on a Wi-Fi environment, but as soon as you got out of the Wi-Fi environment, the cellular environment, for example, it was a disaster.
>
> And think about it. The cellular networks then, you know, got better and better. So at that time, my guess -- I don't know why Google did it, but my guess is it -- the telephone data service, just like the inventor stated, the coverage of the data was not that good at that time. So maybe it was not worth doing that at that time.

Ex. 4 at 453:15–454:10. Dr. Gottesman's conclusory motivations are therefore not even consistent with his own testimony based on his experience as a person of skill in the art at the relevant time.

Flyp thus requests that the Court strike and exclude any of Dr. Gottesman's opinions on motivation to combine (*e.g.*, Ex. 2 ¶¶ 200, 205), along with his obviousness opinions that rely on those motivations to combine (*e.g.*, *id.* ¶¶ 189–190, 195–206, Exs. T-1, T-2, W-1, W-2).

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**E.     Dr. Gottesman's opinion regarding noninfringing alternatives are unreliable because they are conclusory and premised on the wrong date.**

Dr. Gottesman offers opinions on various putative noninfringing alternatives in his noninfringement report. *See* Ex. 1 ¶¶ 2, 138–144. These opinions are unreliable because they are premised on an incorrect application of the law and are impermissibly conclusory. The relevant question in patent law is whether the proffered alternatives were available, acceptable, and noninfringing at the time of the hypothetical negotiations—i.e., at the time of first infringement. *See, e.g.*, *Alacritech Inc. v. CenturyLink, Inc.*, 2023 WL 6797787, at *2 (E.D. Tex. Oct. 2, 2023).

Here, the hypothetical negotiations would have occurred around 2019. *See* Ex. 1 ¶ 54. Dr. Gottesman's opinions are impermissibly untethered from those negotiations and accordingly incorrect as a matter of law. For instance, Dr. Gottesman opines that Google could ■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■. Ex. 1 ¶¶ 138–142. He also opines that ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■. *See* Ex. 2 ¶ 229 (" ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■").

Asked to explain this contradiction—that ■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■—Dr. Gottesman testified that he understands the non-infringing alternative analysis to take place in 2010–2012:





Ex. 4 at 454:24–456:5. By basing his analysis on whether the purported noninfringing alternatives were available, acceptable, and noninfringing before the asserted patents issued—and 7–8 years before the hypothetical negotiation date—Dr. Gottesman's opinions are inherently unreliable because they misapply the law. In other words, this is not a mere question of credibility. If Dr. Gottesman were allowed to present these opinions to the jury and the jury found him credible based on the art in 2010–2012, the jury's decision would be incorrect as a matter of law.

Moreover, even if Dr. Gottesman had applied the law correctly in his analysis, his opinions are impermissibly conclusory. In his report, Dr. Gottesman cites no documents or testimony to support is noninfringing alternative opinions. His deposition only confirmed that he had performed no serious analysis on this issue. His report identifies his noninfringing alternatives opinions as being based on a patent not at issue in this case, the "'843 Patent." Ex. 1 ¶ 2 ("I have also been asked to opine upon non-infringing alternatives available to Google regarding the asserted claims of the '843 patent."). This may be a simple typographical error—but even with significant assistance from Google's attorney and the benefit of his own report, Dr. Gottesman could not identify which patents he had purportedly analyzed to form his noninfringing alternative opinions:

> Q.  So the first paragraph mentions that you've been asked to opine about infringement. In the second paragraph, it mentions, "non-infringing alternatives." Do you see that?
>
> A.  Yes.

Q.  Now, in the first paragraph, there is a list of patents, the '770 patent, the '105 patent, '094 patent, the '554 patent, and the '585 patent; is that right?

A.  Correct.

Q.  And those are the patents that you understand you're offering an opinion on for infringement, correct?

A.  Noninfringement, yes.

Q.  When it talks about, "non-infringing alternatives" in paragraph 2, it says that your opinion is regarding the '843 patent. Do you see that?

A.  I see that, yes.

Q.  What is the '843 patent?

A.  I can't find it right now in detail. There were so many documents and patents in this case, I can't remember exactly right now.

Q.  But your opinion on non-infringing alternative relates to that patent and not the patents in paragraph 1; is that right? …

A.  Those are two different things.

Q  (BY MR. LOGAN) Understood. I'm just making sure I understand the scope of your opinions. And in the second paragraph, it says your opinions on non-infringing alternatives are about the '843 patent. Do you -- do you -- are you offering the same opinions about the patents in paragraph 1 or is that different?

A.  That's -- these are different things. …

Q  (BY MR. LOGAN)  I just want to -- just to make sure I understand here, could paragraph 2 also be a typo and it's supposed to, for instance, be the patents listed in paragraph 1, or was that intentional?

A.  I don't remember right now. I have to see the document and then I'll be able to tell you what it is. I can't tell right now. …

MR. LAURENZI:  Counsel, for what it's worth, it's [Dr. Gottesman's] report, but I believe that is a typo. And that the expert -- he is offering opinions regarding non-infringing alternatives for the asserted patents in this case, the five patents listed in the first paragraph.

Q   (BY MR. LOGAN)   Dr. Gottesman, is that consistent with your understanding, the clarification your counsel just made, that your opinions are actually related to the patents in paragraph 1?

A.  I'm certainly --

24

███████████████████████████████████████████████

MR. LAURENZI:  The non-infringing alternatives, not the second sentence there in paragraph 2.

Q  (BY MR. LOGAN)  Go ahead.

A.  I'm certain about paragraph 1. About paragraph 2, I understand what counsel said and I accept that. To be sure, right now I don't recall exactly on the '843, but if you would need me to state more about it, I'll have to see the documents.

Ex. 3 at 13:15–16:23; Ex. 5 (video excerpt of this exchange).

Dr. Gottesman's understanding of his noninfringing alternative opinions did not get better on review of that specific section of his report. For instance, regarding Dr. Gottesman's opinion that Google could █████████████████████████████████, he testified that he does not know how long that process would take and did not perform any investigation to determine how long it would take. *See* Ex. 4 at 441:20–442:11 ("███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████"). In support of this "estimate," Dr. Gottesman suggests that he spoke with someone at Google or saw deposition testimony that supports it, but he is not sure who, and he did not cite any such conversation or deposition testimony in his report:





*Id.* at 445:7–446:5. Dr. Gottesman does not actually ███████████████. *See* Ex. 1 ¶¶ 237–340.

Perhaps more importantly, in arriving at his "estimate" for how long it might take for

Google to ████████████████████████████████████, Dr. Gottesman

was not aware of—and did not take into account—Google's corporate testimony that it had

Ex. 4 at 444:16–444:20.



Ex. 4 at 446:18–449:13. Dr. Gottesman was not aware of and accordingly never considered those

problems with the ████████████████████ in forming his opinion that Google could easily

████████████████. Instead, he premised his conclusory opinion entirely on a conversation

that he *probably* had with Mr. ████ but did not disclose in his report.

These problems are not limited to Dr. Gottesman's opinions about ████████████████

████ice. He similarly opined that Google could simply use the ████████████████

████████████. Ex. 1 ¶ 240. During his deposition, however, Dr. Gottesman confirmed

that he has no idea how that would be done, how long it would take, or how difficult it would be:



Id. at 456:16–458:12. In sum, what is clear from Dr. Gottesman's report (where he cites no evidence for his noninfringement positions) and his deposition testimony (where he cannot explain his opinions in any meaningful way) is that Dr. Gottesman is offering bare conclusion, not opinions based on any reliable methodology.

Flyp thus requests that the Court strike and exclude any of Dr. Gottesman's opinions on noninfringing alternatives (*e.g.*, Ex. 1 ¶¶ 2, 138–144).

**F.     Dr. Gottesman should be excluded from relying on documents not timely produced in this litigation.**

In his report, Dr. Gottesman relies on substantial evidence about its own systems that Google never produced in this litigation. For instance, in paragraphs 93 and 98–100 of his invalidity report, Dr. Gottesman relies on hyperlinks to numerous articles and websites that he contends describe integration ███████████████████████████████████████████████ . Ex. 2. He cites similar unproduced documents about the operation of Google Voice by hyperlink in his noninfringement report, including at paragraphs 30, 44, 132, and 140. Ex. 1. While ███████ ████████████████ are self-evident, Dr. Gottesman confirmed that ████████ GrandCentral were also acquired by Google and are Google products. *See* Ex. 3 at 161:22–24 (████); Ex. 2 ¶ 240 (GrandCentral). There is no excuse for Google failing to produce documents that it intends to rely on about the operation of its own products. *See* Ex. 11 at RFPs 5, 6, and 8. Dr. Gottesman testified that he had some of these unproduced materials for "[s]everal months" and provided them to Google's counsel. *See* Ex. 4 at 326:11–22. Google sat on those documents, denying Flyp a reasonable opportunity to ask Google's corporate representatives about them. If Dr. Gottesman is allowed to present those documents to the jury, Flyp will have been denied any meaningful opportunity to test their accuracy about Google's purported prior-art products before trial.

Flyp thus requests that the Court strike and exclude any of Dr. Gottesman's opinions based on unproduced documents related to ████████████████████████████ or the Nokia N80 Internet Edition (*e.g.*, Ex. 2 ¶¶ 93 and 98–100; Ex. 1 ¶¶ 30, 44, 132, and 140).

**G.     Dr. Gottesman should be precluded from offering opinions based on the conclusory charts attached to his invalidity report.**

The Court should strike Dr. Gottesman's invalidity opinions based on ████████████ ███████ because he makes conclusions in his report based on claim charts that provide no significant analysis beyond simply copying and pasting disclosures from various documents. *See*, *e.g.*, Ex. 10.

███████████████████████████████████████████████████████

During his deposition, even Dr. Gottesman was unable to determine from his chart how he was applying the prior art to the claim elements. Ex. 6 (████████████████████████████████████████

████████████████████████████); Ex. 4 at 315:1–319:10 (same). Other courts have found Dr. Gottesman's approach in relying on such charts insufficient. *See Mettler-Toledo, Inc. v. Fairbanks Scales, Inc.*, No. 9:06-CV-97, 2008 WL 11348468, at *4 (E.D. Tex. Oct. 27, 2008) (excluding expert testimony because the expert's "conclusions are beyond succinct and consist entirely of a series of claim charts with unhelpful and unenlightening 'analysis'").

Flyp thus requests that the Court strike and exclude the charts attached as Exhibits T-1, T-2, W-1, and W-2 to Dr. Gottesman's invalidity report, along with any opinions in his report that rely on those charts (*e.g.*, Ex. 2 ¶¶ 189–190, 206, 229).

### H.    Dr. Gottesman should be precluded from offering opinions on Burner.

During his deposition, Dr. Gottesman was unable to explain with any specificity what functionality in Burner he contended was the bridge telephone number and could not confirm whether he contends the Burner Number is the bridge telephone number. *See* Ex. 6; Ex. 4 at 315:1–319:10. The bridge telephone number is an element in every claim that Dr. Gottesman challenges in his report. *See* Ex. 9; Ex. 10. He should accordingly be precluded from testifying that Burner anticipates the claims or otherwise satisfies the bridge telephone number limitation and particularly that the Burner Number is the bridge telephone number.

Flyp thus requests that the Court strike and exclude Dr. Gottesman's opinions regarding Burner, including that Burner anticipates or renders obvious any of the asserted claims (*e.g.*, Ex. 1 ¶ 130; Ex. 2 ¶¶ 111–119, 189–190, 228; Ex. 9; Ex. 10.

## II.    CONCLUSION

Flyp therefore respectfully requests that the Court strike the portions of Dr. Gottesman's reports identified above and preclude him from testifying about those topics at trial.

██████████████████████████████████

**DATED:** November 14, 2023

Respectfully submitted,

*/s/ Thomas M. Melsheimer*
**Thomas M. Melsheimer**
Texas Bar No. 13922550
tmelsheimer@winston.com
**M. Brett Johnson**
Texas Bar No. 00790975
mbjohnson@winston.com
**Michael A. Bittner**
Texas Bar No. 24064905
mbittner@winston.com
**C. Charles Liu**
Texas Bar No. 24100410
ccliu@winston.com
**Steven R. Laxton**
Texas Bar No. 24120639
slaxton@winston.com
**WINSTON & STRAWN LLP**
2121 North Pearl Street, Suite 900
Dallas, TX 75201
Telephone: (214) 453-6500

**Matthew R. McCullough**
California Bar No. 301330
mrmccullough@winston.com
**WINSTON & STRAWN LLP**
275 Middlefield Road, Suite 205
Menlo Park, CA 94025
Telephone: (650) 858-6500

**William M. Logan**
Texas Bar No. 24106214
wlogan@winston.com
**Evan D. Lewis**
Texas Bar No. 24116670
edlewis@winston.com
**WINSTON & STRAWN LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002
Telephone: (713) 651-2766

**ATTORNEYS FOR PLAINTIFF**

████████████████████████████████████████

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2023, a true and correct copy of the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system. As of this date, all counsel of record have consented to electronic service and are being served with a copy of this document through the Court's CM/ECF system and by email. Administrative Policies and Procedures for Electronic Filing in Civil and Criminal Cases, Western District of Texas, Section 14.

/s/ *Michael A. Bittner*
Michael A. Bittner